May I take the final matter of NAACP v. City of Philadelphia? May I, sir? May it please the Court. Craig Gottlieb, representing the appellant in the City of Philadelphia. I'd like to reserve three minutes for rebuttal. Okay. I'd like to focus first on viewpoint neutrality and second on reasonableness. With the issue of viewpoint neutrality, it's not on the record, but many points are hypothetical. This poster, which is a very attractive poster, let's assume the same, some outside, let's say it was the Chamber of Commerce, U.S. Chamber of Commerce, wanted to put exactly the same graphic up. But instead of the text that's there, they said, Welcome to America, land of the free and the home of the brave. Can you, by the faintest gesture of imagination, tell me that anybody would have any problem displaying that poster? Who gave a standing ovation when he said it? There were a lot of standing ovations, however. That was his lead-off. There probably wouldn't be any problems. Nobody would have problems with displaying that poster. Nobody would have problems with putting that poster up? No. There would be no problems with displaying the poster, but it would not get displayed. You wouldn't display that poster yourself? No, that's what told me that. Correct. Because it's not commercial? Correct. Okay. But wouldn't you be on a much stronger footing if you only permitted commercial displays? But that's not what you're doing. You're also engaging in government speech from time to time. I think the ACLU brief cited Craft Beer Week or something. There was a beer drinking week, I think, too. What was that? I don't know what that was. Wasn't that the city? Don't worry, you'll get an extra. Wasn't that the city speaking? Wasn't that government speech when the city said that? There are government speech signs, yes. The government does speak in this context. But what makes this case so unusual is I can't find any case anywhere where the medium, in this case the 100 electronic billboards, is a hybrid that includes commercial speech one minute or one day, and then government speech the next minute the next day. And it's compounded by the fact that the passersby may not recognize the government speech as government speech. I might think that's the Craft Brewers Association paying to put up that ad. Well, Your Honor, we're talking about the First Amendment rights of the speakers, and it's clear that there are private speaker spaces that have very strict, unambiguously strict, commercial and non-commercial rules where there are no exceptions. And from the perspective of the speakers, those rights are entirely clear. And then don't the rules have to advance the restriction? The rules, in order for it to be reasonable, and that's the test, and I think everyone agrees on the nature of the forum here that it's either a limited public or non-public, and I assume that's the same thing and we agree on that. Don't the rules, in order to be reasonable on that test, have to bear some purpose in terms of advancing the underlying reason for the rule? Does that make sense, that question? Yes, it does. My answer is yes, they do. Well, on this record, how have you established that? You've got Terrell, who was a great witness for your opponents, and you've got the Kessler affidavit where she lists all these things that were displayed. I don't know if that's before the 2011 written policy or not, but it appears to be that a lot of them were after the 2011 policy. And when I go through there, I see all kinds of things displayed that seem inconsistent with your requirement. Well, I think that there are – let's say what the reasonable question is not. The reasonable question is not did the city actually believe a good reason. The city's actual thoughts and thinking about the promotion of this particular policy doesn't matter. The city's underlying motivation and thoughts don't matter. What does matter, this goes to your question, is whether the policy is reasonable. And I believe that's what you're asking me about. As far as the question of – And whether your actions are consistent with the bill's policy is also. That may go to whether the policy is reasonable. Whether it's discriminatory in the way it's applied also. I'm sorry. Whether it is being discriminatory in terms of viewpoint discrimination. Well, I don't think there's any suggestion that there's a selected application of this policy. This is a facial challenge, right? This is a facial challenge, and all non-commercial ads are excluded. That's not debated. All non-commercial ads in the advertising space are excluded. And if you did that, then you're in the clear, right? But you choose to engage in government speech on the same billboards where the commercial ads are being posted. Government speech is different. Government speech is different. In fact, we know from Sulum and from Walker that the government can discriminate based on viewpoint. Correct. But here's the rub. In Sulum and in Walker, the court deemed the monuments in Sulum to be plainly government speech as opposed to what a group of individuals congregate in that park. And likewise, on the license plate in Justice Breyer's opinion, he talks about how license plates are the province of the government. But here you've got a billboard that sure doesn't look like, you've got these electronic billboards that sure don't look like government speech, particularly if one day I walk by and I see an advertisement for Chevy trucks, when the next day on the same billboard I see, you know, celebrate the pub's visit or craft beer week or whatever the city is trying to promote. I mean, this is perhaps a technicality, but I don't think that the individual billboards change from private to government. There are a bunch of billboards together, so there are maybe ten that are together. So you're saying some of the hundred are dedicated toward commercial advertising and some other percentage are dedicated toward the government speaking whatever message the city chooses to convey? I believe that's correct. I'm also not sure that they're all together. Where's that in the record? I mean, that's news to me. Me too. Well, I'm not sure that it matters, Your Honor, because they're all, I mean, I admit that they're all together, and there's maybe ten. If you look at the record, I think it's 1230 of the record. That's the pictures of all the signs. Here's why I suggest it matters. The reason I suggest it matters is that if the city is going to, on behalf of the government, celebrate craft beer week, a board member of Mothers Against Drunk Driving walking through that airport might say, well, I'd like equal time. You know, we've got some money in the bank, and we'd like to buy an ad for that, and you're going to tell them they're not allowed. That's correct, but that's no different than suing Milwaukee. On our speech, we get to do our speech, and on the rest of the speech, on the private speech, we have to be neutral, and we are. So it's really, as long as you say you have to be neutral, what troubles me here is the word controversial. I don't know how you can have a policy which is conceded to be something which avoids controversy. The minute you say you're trying to avoid controversy, how is that viewpoint neutral? Well, Your Honor, just to be clear, the policy itself distinguishes between commercial and noncommercial. The controversy aspect is a justification of that policy. Okay, that's what he said. But we don't exclude ads. We don't make the judgment as to whether they're controversial or non-controversial. The judgment is whether they're commercial or non-commercial. And the reason for that is the controversy. Correct. That goes back to your question from a few minutes ago as to whether the ends are furthered. Under Lehman and under Children of the Rosary and under Smart, it's very clear that the distinction between commercial and noncommercial does further the end of avoiding controversy and maximizing revenue. If I may, and I'll give you a chance to, when you get back up on rebuttal, perhaps to point me in the right direction, you've got a pretty good argument that, hey, we theoretically, these written policies, we want them to be, we want advertisements to go up there that are either commercial, we want them to be viewpoint neutral, we want to raise revenue, and we want to avoid controversy. I can see those are all good reasons. But when I look in the record, my problem with what you have here is that when you talk about neutrality, in appendix page 803, and this is a deposition, you're not talking of, I assume it's Turrell, you're not talking, are you aware of anything in the manual that says its purpose, the written policies, is to maintain a position of neutrality? Answer, I'm not aware of that, no. Question, I'll ask those same questions, but not in terms of the manual, but in terms of any written documentation of any kind, anywhere, that says the purpose of the rules and regulations, policies of the airport is adopted, and one of the purposes is to minimize the appearance of favoritism. Do you recall seeing that anywhere? Answer, I don't recall seeing that anywhere. Question, you also don't recall seeing anything that says the purpose of these rules and regulations is to minimize our risk of imposing on a captive audience, correct? Answer, I don't recall ever saying that, no. Same for maintaining a position of neutrality. Answer, I don't recall ever saying that. Are any of these things that you believe are purposes of the way you operate the airport? Answer, not necessarily, no. That's what I've found so far on viewpoint neutrality. When it comes to revenue, I go to pages, and also avoiding controversy, pages 807 and 808. And you would agree with me, would you not, that distinguishing between ads that propose commercial transactions and ads that do not propose commercial transactions have nothing to do with how much revenue can be generated? Answer, I'm sorry, say that again. Question, you can generate revenue from an ad that proposes a commercial transaction or an ad that does not propose a commercial transaction, correct? Answer, correct. And that distinction that the policy draws between what kind of an ad and the other, that has nothing to do with revenue, correct? Answer, I do not believe so, no. Question, you do not believe that it has anything to do with revenue? Answer, no. Does distinction have anything to do with whether an ad is likely to offend? It may. The answer is, question, and that's because in your view commercial ads are less likely to offend than non-commercial ads? I would agree with that statement as the answer. Question, is that something that has ever been discussed in any meeting or conversation you've had about whether commercial ads are more likely to offend or less likely to offend? Answer, I don't recall. So when you say it may, that's just something that you're thinking of as you sit here. Answer, yes. Which goes back to my question, because that's what I was getting at with my original question. So what I would say, Your Honor, is that the record certainly suggests that the city's subjective intent may have had many different suggestions. It might have been revenue, it might not have been revenue. It might have been viewpoint discriminatory. But you're telling us right now the reasons for the written policies were enhance revenue and avoid controversy. And those are good reasons,  No, you don't, actually. You don't. You don't. That is the key. You can make it up now. Well, perhaps in the way you make it brief. I'm sorry? Well, when you make it brief. Because I don't have a way to make it up. This is not an unusual phenomenon. The city's reasons could be, and this goes to the viewpoint and Charlie point, the city's reasons could be to maximize revenue. They could be to eliminate controversy. They could be for viewpoint discriminatory reasons. Well, I'm trying to get at it. Those are your reasons. The way you achieve that end has to be reasonable, doesn't it, in order for your policy to be reasonable? It's two different questions. One is, what were the city's actual reasons? And second, I submit to Judge Ambrose that it doesn't matter what the city's actual reasons were. The city's actual motive is irrelevance. But you need a reasonable justification, Chief Judge McKee's point. If you're saying these are our reasons, but then you have a deposition where you say these aren't our reasons, you've got a problem. I don't think you do. I don't think it matters what the witness says. The city's actual reasons. It doesn't matter what your witness says. We can really streamline civil litigation in this country. We can eliminate discovery. We can eliminate depositions. No more interrogatories. Because that stuff's all irrelevant. I happen to agree with you. It's not subjective. But can you cite some case law to help yourself out? Because you're getting hit pretty hard here. Yes. You better start throwing something better than that. Trust me. It doesn't matter what the witness says. I would love to cite some cases. And I would also like to answer your question about how the government speaks. Well, right now, try to get your own life. Try to get your own life. Try to get your own life. Okay. This is exactly what Crossbound talks about. This is exactly what Crossbound talks about. Wait, hold on. Which case? Crossbound. Okay. Seventh Circuit case. Sons of Confederate Veterans. That's a Fourth Circuit case. This is the O'Brien case from the Supreme Court. And these are all articulated in the brief. The Capitol Square case. The Hill case. All these cases support the point that the government's subjective motivation, even if viewpoint discriminatory. So forget whether the government has objective motivation. It has to be reasonable, though. It has to be reasonable. Explain to us why, independent of subjective motivation, explain to us why you can get over the reasonableness hurdle. Okay. We can get over the reasonableness hurdle because it is common sense, as I believe Judge Emmer suggested when he first started questioning me. It is common sense and inherently reasonable that a commercial, non-commercial distinction will maximize revenue. Explain that one to me. You're saying if you don't get revenue from non-commercial postings, and we call them ads, that is enhancing revenue. Because you can charge people to post this stuff. It will actually enhance the revenue by not taking in the money. By not taking in non-commercial money because more commercial advertisers will come. Because the record, Terrell's deposition, is to the contrary. He said not. They had, during the few months this was posted, he didn't lose any advertising money so far as he knows. Is that what you're getting to in terms of his testimony doesn't matter? No, that's a different point. Terrell actually says both about this. He says at one point it doesn't matter. But if you look at page 1116 of the appendix, he does say it does matter. He says advertisers will look at that. So he goes both ways. But this is not, we're not simply asking for a new trial on this point, a trial on this point because these issues are disputed. My point, Your Honor, is that as a matter of law, this court can determine as a matter of common sense that commercial advertisers will be dissuaded. But it's also common sense that if I want to sell something to someone, I don't want to eliminate a huge segment of the market. That's common sense, too. I think that's called. When you have two reasonable possibilities, both are reasonable. What if 90% of the potential purchasers of your electronic billboard space are nonprofit issue advocacy groups? What if the Walmarts and the Targets of the World don't care to advertise on airport billboards, but the NAACP and the NRA and every other acronym group really likes to post on billboards? Wouldn't you maximize revenue by opening up to all of them? I suppose I would agree that if the NAACP brought in that proof, that may undermine the common sense proposition that I'm offering. But my common sense proposition comes from the Supreme Court's decision in Lehman. It comes from the Smart case, it comes from the Children of Poverty case. I'm sorry, isn't the form in Lehman very different and doesn't that undermine your argument? I don't think it is. It's really different. I think it's proprietary government speech. I thought you agreed it was a limited public forum. Well, just to be clear, I think everybody agrees that it's the forum that requires reasonableness and viewpoint neutrality. There's some confusion. Except when we flip the billboard and the government speaks, in which case neither are required. I would still like to address that issue as well, yes. That's correct. So these billboards are changelings. One day, one hour we apply one legal standard and another day, another hour we apply a different legal standard. These billboards are Hogwarts. These are magic billboards. The standards are consistent. What changes is whether it's government speech or not. By the way, Your Honor, just way past my time, but real fast. The signs do say when there are city signs. It says Philadelphia Airport presents. So a passer, to the extent that my position is that... So the beer drinking week said Philadelphia Airport presents? It does. It does, yes. It does. The beer drinking week is not actually part of the signs that we're talking about, but there are other Philadelphia signs such as welcome to Philadelphia signs that are clearly from out of Philadelphia or from the airport. So those signs are on 1230 to 1232 of the record. There's a mixture of private signs which are strictly commercial and then the city signs which will identify themselves as city signs. Although I don't think that ultimately matters because I think that the First Amendment looks at it from the perspective of the speaker, not from the person that's walking by. And from the speaker's perspective, the rules are very clear. The government can speak its viewpoint as in Sulum, as in Walker, and private parties are all, no matter what their viewpoint is, limited to commercial speech. Thank you. You saved some time, I think, didn't you? Three minutes, yes. Okay, thank you. Mr. Magaziner? May it please the Court, my name is Fred Magaziner. I represent the NAACP in this case. We have kind of a remarkable proposition in this case. The law says that for a restriction on speech to be upheld, the government has to make a showing in a form that's non-public or limited public, as this one has been held to be, a showing of a legitimate governmental purpose and that the restriction somehow serves that purpose. We have the city of Philadelphia coming in and saying, well, we don't have to show what the purpose was. We don't even have to show that anyone in the city had any purpose. If we, the litigation lawyers, in writing our brief, can dream up a purpose, that suffices. And they say we don't have to look at the evidence and what the purpose was, whether the restriction serves a purpose, because the Court should substitute its common sense for the evidence, which is to the contrary. Look, Cornelius, he did cite the cases. I challenged him on that. Cornelius, Lehman, and Children of the Rosary v. Phoenix all support that proposition. Are you saying we should just disapprove of the reasoning in those cases? We can't. Lehman is a Supreme Court case, so we can't let him do that. I'm happy to distinguish Lehman, Your Honor, but let me, before I forget to do this, I want to bring to the Court's attention two or three cases which are very important because we did not follow Sir replied brief, of course. I would like to cite those to the Court, if I may, and then I'll get to Lehman. One is the San Martano v. First Judicial District, 303 F. 3rd, 959. That's an 11th. . . Is that the Ninth Circuit case? That's the Ninth Circuit case in 2002. That Chief Judge Thomas wrote? Yeah, the Herena v. Granite City, which is a Seventh Circuit case, 548 F. 3rd, 1107. And there are some other cases I may mention as we go along. As to Lehman, there are a number of distinctions. Number one, in Lehman where the Court . . . By the way, I'm sorry. It was Judge Fletcher who wrote that, San Martano. It wasn't Thomas. And I . . . That's okay. I don't remember which one was it. I won't. But, Judge Hartman, let me try to address your question about Lehman. In Lehman, it is true . . . You know what? I'm sorry to interrupt you, Mr. Magazine. But before you do that, let me give you a little guidance, if I can. Sure. What my concern is in those cases, I don't see a record of objective evidence that would show whether posting interest groups' ads on buses or lists of charities that federal workers could donate to . . . I mean, where is the record evidence in those cases to say that this, in fact, would cause controversy rather than just appealing to the . . . deferring to the organizations, hey, trust me, we don't want to get into this sort of thing? In . . . I can't answer where the record evidence was. In many of the cases, and Lehman is one of them, there was, as far as one can tell from the opinion, no evidence submitted whatsoever by the person seeking to speak. In Lehman, I read the Supreme Court opinion that you've read, of course. I read the Ohio Supreme Court opinion from which the appeal was taken to the United States Supreme Court. There is no evidence that anyone tried to counter this premise or assumption that by excluding noncommercial speech it would maximize the revenue. So we have the Supreme Court saying, well, that's common sense. Well, maybe it is, maybe it isn't. I would say if we had . . . if there's room for common sense in deciding cases, common sense should be defined as a proposition with which no reasonable person could disagree. That's the Fred Magaziner definition. You said Magaziner. Do you know who this girl is? It's usually the person we have a partnership with. Well, she is in my firm. But your definition, that's a clear winner. I mean, because obviously reasonable people could disagree. I guess another way to put it, perhaps a little bit crassly, is how the heck do I know or any of us know whether allowing the NRA and the NAACP and every other acronym group to buy space at the airport is going to increase the Walmarts and the Targets of the World from wanting to spend their money on that or decrease it? How would we ever know? You almost have to bring in advertising executives from Madison Avenue to give expert testimony on that. I have two answers to that, Your Honor. I'm very glad you asked me that question. Number one, it's not a matter of common sense. Just as Your Honor said, this is something that we don't know is a matter of common sense. This is something that could be proved. In the city of Los Angeles versus Alameda case, Justice Souter in his dissent . . . well, Justice O'Connor in her majority opinion said there has to be evidence to support the city's ordinance. That was a zoning ordinance. It can't just be because the city says so, there has to be evidence. Justice Souter in his dissent says it's really dangerous to rely on common sense. Common sense, when you dig into it, is almost always nothing but conjecture. Where something is susceptible of proof, we ought to require evidence. And they have to prove it, don't they? You have to disprove it and say, this rationale is hogwash, it's unreasonable. There's really a presumption of reasonableness that comes with the government action here in drawing the commercial and non-commercial distinction. I would respectfully disagree that there's a presumption of reasonableness. I think what the cases all say is that when the government restricts speech, even in a non-public forum or a limited public forum, the government bears a burden of showing that it has a reason and that the restriction relates to the reason. And it has to relate to the reason by furthering the purposes for which the forum has been constructed. The best case, Your Honor, if you can think about that, is ISCOM. In the ISCOM case, that's a Harry Kushner case involving the three airports in New York. That's a case where Justice O'Connor, upon whose concurrence you rely, said that leafleting can occur in airports. That was written in 1972. How many votes of the nine do you think would agree with that today? Airports are radically different now than they were in 1972. The description of the airports in New York in 1972 is pretty close to the description of Philadelphia today. He says it's not just an airport. It's like a shopping mall. It's a multi-purpose environment. You couldn't get into these things. You had to pass through a magnetometer and be subjected to a body search, and you can't get through unless you have a boarding pass? The 83,000 people on average who pass through the airport today are people in the terminals. They're not the people who drop off people at the curb. Eighty-three thousand people pass through that airport every day. I thought everyone agreed below, including the district court, that the forum here is not the airport writ large, but rather the hundred electronic billboards. We said you ought to look at the airport writ large. But she disagreed with that. Right, and she adopted the city's preferred definition, and that's consistent with this court's decision in Christbride. But there's another point that you raised that I wanted to get to, Judge Hartman, and this comes back to Iskander, whether the nature of airports has changed. Iskander's a bit different because they've got the flow of traffic and the problem with leafleting, obstructing the flow of travelers and leafleting, which was a concern. They said there were two prohibitions. One was soliciting funds, and the other was leafleting. And the court held that it was reasonable to prohibit the solicitation of funds in the airport and held that it was unreasonable to prohibit leafleting. And the explanation of why it was unreasonable to prohibit leafleting really comes from Justice O'Connor's opinion. What she says is the Port Authority, which runs these airports, has given us no evidence, no justification for their prohibition on leafleting. On this record, with no justification, I have to find that there's no basis to prohibit leafleting. It is the government that has to prove and show the justification for what it's doing. And in this case, to come back to your question, Judge Hardiman, about who knows whether the revenue would be enhanced or minimized, we have evidence. The city was supposed to show that it would decrease revenue, but we have the city's deputy director of the airport was asked point blank, if it were up to you, would you display every ad that someone was willing to pay for? He said, yes, I would. He said, I, as a business person in charge of maximizing revenue at this airport, would display every ad, commercial or noncommercial, that someone was willing to pay for. All right, what about avoiding controversy? Are there any cases from the federal courts where the municipal government drew a distinction between commercial speech allowed, noncommercial speech prohibited? Were the court held that that was invalid? In a nonpublic forum? Yes. I can't, none come to mind, but the, well, but there are no cases. There are a lot of cases where they do it. I mean, think of the bus cases. There are a lot of advocacy groups that want me sitting on a bus to read their message. Bus cases are all over the place, Your Honor, as you know, and the AFDI cases of which are now about a dozen or so. But what I don't think is all over the map, and I could be wrong, but I need you to correct me if I am, what's not all over the map is this bright line distinction where the government can say, we're only going to allow people to sell soap and we're not going to allow them to speak their mind about important social or political issues. The cases that have upheld that have done that without there being any record on which, no. Right. That's the problem here is they get a presumption. We have an effort here. We ask, is it, obviously a commercial, noncommercial distinction makes no sense. The purpose is to avoid controversy, and I should point out the case after case says it's not really a government function, proper function, to avoid controversy, which is what the government is saying here. By the way. So they need to allow ads from, you know, Al-Qaeda may still have some money. Have a nice flight. There may be a bomb on your plane. No, I wouldn't say that. I think the government, the city of Philadelphia could, if they have a problem, or if they anticipate a problem, they could address it by creating a policy, not defining what the problem is, creating a policy that bears some relationship to the problem that they've identified. But isn't the fairest and easiest policy just to draw a line between commercial and noncommercial? Right. Because once you allow noncommercial speech, then the cat's out of the bag, and everybody can say whatever they want. I wouldn't agree with that, Your Honor, with all due respect. You want them to shut down the offensive speech or the scary speech or the speech that's going to give their, you know, passengers anxiety? You want them to shut that down on an ad hoc, case-by-case basis rather than by up front drawing a bright line? Not at all. But I would like to make two points, Your Honor. The first point is commercial and noncommercial doesn't really avoid controversy. An abortion clinic, Planned Parenthood could say, we provide low-cost abortions. That's commercial. That would get posted. I thought they were a non-profit. It's not commercial. It's a commercial transaction. It doesn't say, it doesn't, this regulation doesn't depend on who the speaker is. It depends on whether a commercial transaction is proposed. So if you say, we provide abortions or we provide abortion counseling, let's say some other group, if there's a fee for it, they can post that ad. They can post an ad saying, guns, we sell guns. In light of all the massacres that have occurred, you would do well to arm yourself. Buy a gun. That would be a gun store posting such an ad. That could get posted. It could be as controversial as anything you can imagine. The problem they have is that commercial and noncommercial does not in any way correlate to what is controversial or not controversial. Some of the noncommercial ads, and NAACP ad is one, are not the least bit controversial or provocative. If the city is concerned about what other ads they may open themselves up to, we have no history of anyone ever asking to post an ad at the airport, which poses the kind of problems the city is maybe imagining, and maybe the city can come up with some policy that addresses that. They haven't, but they could. What we have on this record is the city. How would they do that? The city could identify a problem, whatever the city thinks the problem is, and the city could say, all right. But the problem is controversy. They don't want passengers getting ready to fly to be, you know, in a kumbaya mood, not in a, gee, I'm afraid my plane's going to crash. I think, as Judge Roof pointed out, the city can't say avoidance of controversy is a proper purpose in this context of an airport where there are 126 televisions. If you were at the airport last week, Your Honor, you would have seen TV broadcasts and 126 TVs of a gunman going on a rampage in Oregon, of people being beheaded, aid workers being beheaded in Syria, of refugees drowning in the Mediterranean. They have not created a Disneyland-type situation there where they say, oh, any controversy is upsetting. They are selling liquor. They ban liquor ads, and then they have a duty to sell liquor. They ban sexually suggested ads. If you look at our appendix, they have posters inside the stores that they ran out of sexual, of a woman whose body, a naked woman, painted like an American flag. I mean, the city has not created this. But the only distinction is that's private speech, and, you know, you know it, and they're saying, well, our boards are government speech. Well, the boards aren't government speech. But they're really not when they let them out for commercial purposes. No, and by the way, I don't think they're going to. What if they're, could they just shut this down on 100 boards and just say, we're only going to do government speech on the 100 boards. Everything we post on these 100 boards are going to say, brought to you by the city of Philadelphia. And then they can say whatever they want the same way in Walker, Texas, can allow dictate what's on license plates in the same way that Pleasant Grove can dictate what monuments are posted in their park. What the city could have done when it decided for the first time to adopt a policy in 2012, which it said it did because the NAACP sort of brought this to the forefront of Terrell's mind. What the city could have done is it could have said, the only ads that will be placed on these electronic boards will be city ads. That would have clearly been constitutional. Okay. And they can say whatever they want because it's government speech. Absolutely. And there's actually no revenue coming in there. No revenue. The city could have said, we're only going to allow airline ads for destinations that our airlines fly to. That probably would have passed muster, probably. Have to think about that some more. They could have said, by the way, if you look at the record, the city witnesses go back and forth about what their real purpose is, but one purpose is only to have ads that promote the city. They could have had a policy that says the only ads will be ads for Philadelphia tourist attractions. But that's not what they did. They invite all sorts of ads for anyone. They allow elsewhere at the airport all sorts of stuff that is controversial, provocative, potentially offensive. And then they say, no. Be careful, Ted. We're talking about the giggles here. I know I'm out of time. Go ahead. If I may, that came up. Go ahead. First of all, you said, there's something in the record that says that the electronic monitors that portray government speech are dedicated to that. And I can assure you nothing whatsoever in the record that says there's one set of monitors dedicated to government speech and another set dedicated to private speech. But do you agree that when they talk about beer drinking week and LGBT week, there's a disclaimer on there, an identification of that? It says PHL. It has the airport logo on it. That's all, just the PHL logo? No, the ones that I could see in the appendix. They're in the appendix. They're on the same boards as commercial private speech. Your Honor asked about when the Kessler Affidavit photos were taken. They were taken in 2013. Okay. After the policy. There's another set of photos which were 2011 before they adopted the policy, but the Kessler Affidavit and all those photos were taken in 2013. Let me ask you, I had asked your opposing counsel that if you had, as your reasons, viewpoint neutrality, but you also had maximization of revenue and to avoid controversy, if the city gave support for those reasons, wouldn't this, what the city has done here, pass muster? If the city had adopted the policy through some process by which it had determined that avoiding, barring noncommercial ads would maximize revenue, we would have a very different case. Of course, they didn't do that. On the avoidance of controversy, I would disagree with that, Your Honor. I don't think in this airport context filled with the kind of speech that it's filled with, with the kind of controversial, potentially offensive, potentially provocative speech that it is filled with. Well, there I think your argument would have to be similar to what the D.C. Circuit did in the Namibia case where they said that you're going to have to take a look at not just the limited forms that is suggested, but rather the circumstances in the entire airport, some of which you've pointed out. It's the same thing in the airline pilot's case where the Seventh Circuit did the same thing. I understand that, but I thought here it was agreed that we're dealing with a limited public forum. We are. And in the other cases they were dealing with, whether it's a limited public forum or a nonpublic forum, the standard is reasonableness and viewpoint neutrality. And when looking at the forum, which is the ad spaces, and it's kind of artificially defined under the forum analysis that the Supreme Court has created, but Judge Roof is quite right, and her opinion explains why it's quite right, that you have to look at it in the context where it exists. If this were a single billboard on a piece of city property, stand alone, the result might be very different. We're talking about ad spaces in an airport that is filled with all sorts of other expressive activity of every kind of conceivable nature you can imagine. Why isn't it reasonable to suggest that we are adopting a policy and it is a good idea to avoid controversy? Why is that not reasonable? Because in this context, controversy is something the city has invited. The city owns this whole airport. The city could have chosen not to have CNN televisions. CNN pays the city for the privilege of having CNN televisions, so the city decided to have them in with all that is entailed in those newscasts, most of which, or a lot of which, is quite disturbing, offensive, and controversial. The city didn't have to rent all the stores that it rents, but it decided to rent a lot of stores to raise revenue, and they display all sorts of controversial stuff. We showed from the pictures guns in ammo magazine displayed in the window of a store, sexually suggested ads displayed in the window of a store, liquor being sold in duty-free shops even though the city said they don't want to sell liquor. So the city created this environment, and it is very much, I understand that the security is different, but the airport environment is very much, as Justice O'Connor described it in ISCON, as much a shopping mall as a traveling hub, and the city has to show that controversy is incompatible with this forum. That's what the reasonable test requires. Incompatibility with this forum, and this forum includes everything that surrounds it. Thank you. Mr. McNeil, thank you very much. Mr. O'Connor, I believe you have a couple of minutes. Thank you, Your Honor. Thank you, Your Honor. I'd like to make four points, if I could. Four points? How many minutes do you have? I have three, so I have 45 seconds. On the question of what the city signs actually say, I'm looking at 1201 of the appendix, and it very clearly says at the top, Philadelphia International Airport recognizes, and then it goes on to say whatever. Beer Week. I'm sorry? Beer Week, the Beer Drinking Week. Well, and then the Beer Week is actually something different. The beer issue is that there's a sign on 1298 and 1299 of the appendix, and that's an entirely actually different category. The beer, that promotes Philadelphia beer legacy in a display. It's actually not part of the advertising program that we're talking about right now. It's an entirely unrelated. It's also a city initiative, and it's clearly a city initiative. It's not even one of the 100 wall-mounted monitors that this case is about. Second point, Your Honor, two of you seemed incredulous about my point that motive is simply irrelevant, but I referred to Grossman before, and there are a lot of cases in the brief to talk about this, but Grossman has a section called The Role of Motive in Constitutional Doctrine, and that's just one of it. It says a lot of other cases. I guess what I'm saying is if you're going to say that something's reasonable, and I have no problem with that, then that means it has to be backed up by reasons, and if you say it's backed up by reasons, then you have to give support in the record for those reasons. My concern was at the tail end here. I don't have a problem saying that you have to give something that's reasonable. I don't have a problem saying what you've said here could be reasonable, avoiding controversy. My problem is you then have to back it up with something, and I don't see anything in the record that does that. That's my problem. Even if one or two of your witnesses hurt you in that regard, what's to stop you from proffering affidavits or testimony from a more senior executive or someone? I know so-and-so said this, but he wasn't in the room when the decision was made, or he wasn't paying attention. You have all kinds of opportunities to do what my colleagues have challenged you to do. I say none of those matter. None of those matter. None of those matter. So the reasons are strictly in the realm of lawyer argumentation, not witness? Correct. Let's assume for a minute you might be right about that. The lawyer's argumentation still needs to persuade the court, and would you not concede that that argumentation is typically more persuasive if backed up by some evidence on the ground as opposed to backed up by nothing or perhaps evidence that seems inimical to the lawyer's argumentation? Yes, but our evidence or our argument is backed up by Lehman, and it's backed up by Children of the Rosary, and it's backed up by Smart. All three of those cases found accepted the exact same arguments that we're making today. But did those cases have testimony from their clients or members of the client? Did they undermine their lawyer's position? Well, the undermining of the position is ultimately what Mr. Tyrell said. If you look at 1141 of the appendix, the question was why do you have a distinction between commercial and noncommercial, and he basically says I'm not really sure. But he also says, look, to me I would sell all the space we've got. There's no shortage space in there, and we've got a lot more room to sell, and I'd sell it to anybody who came along, basically. I wouldn't say anybody, but he would not limit it in the way that it is limited under the written policy. He also says, as I said before, advertisers look at that question. They may look at it, but in the three months that the ads ran, there was no problem, no drop-off of revenue that he was aware of. Nobody complained about the controversy that was created by the poster. To get back to Mr. Magaziner's point, to the extent that there's something on this record which undermines your common-sense argument, maybe the common-sensical argument is not so common-sensical. If I may briefly just talk about what undermines it, this argument that there were no complaints. I'm going to draw the court's attention to the ISCON case where the court specifically said, airport travelers are, quote, frequently on tight schedules. This in turn makes such visitors unlikely to stop and formally complain to airport authorities. That's ISCON? That's ISCON, yeah. Okay, but that's a really good one. You've got a physical book in there soliciting pamphleting that's different than passive signs, isn't it? Well, I don't think it's different in terms of people being on tight schedules and not having time to reach out. I've got it real close, and I have never, ever stopped to watch the fine print on the sign when I've got ten minutes to get to security. Wait a minute, what's the disclaimer on it? I don't do that. I just haul butt through the airport. So you don't have time to complain? And regardless, Your Honor, this point about how there has to be evidence of controversy, the only evidence of actual controversy that I could think of would be a problem. But the law is very clear that we don't have to wait for an actual disruption to implement a prophylactic policy. But, Mr., his point is that it's got to be reasonable. To accept that there's evidence on the record that suggests that the reasons for the policy don't advance the policy, then there's an issue. I think that's what he's talking about. There's an issue about how reasonable the policy is. It's undermined by the testimony in the record. It's not that reasonable. It seems that it's faked to be okay. The only evidence that suggests that it's undermined is this idea that there are no complaints. But as I just said, that's meaningless in the context of the effort. The fact that there are no complaints is meaningless in terms of whether or not they had generated policy? It's meaningless in terms of? Whether or not something is controversial. Whether or not something is controversial. Is it getting the answer to that question, whether or not there are complaints filed, is a meaningless inquiry? Perhaps I overstated when I said it's meaningless, but it doesn't overcome the presumption that's created by Lehman in the first place, that there is a common-sense connection between excluding non-commercial signs and eliminating controversy. Lehman, by the way, the problem I have with too much reliance on Lehman is the context in which it occurs. The four might be similar, but the locus is very, very different. Basically a captive audience. You're sitting on a bus, and they weren't deciding that the bus would be the same. There you're right. That would be the same under a CBM case. I'm going way over, so I'll leave you with this, Your Honor. If you look at footnote 12 of the dissent in Lehman, Justice Brennan's dissent, you'll see that the forum in Lehman wasn't just the inside. It was the inside signs and the outside signs. The outside signs you've got a better argument. You're right. There's the outside signs. That's part of the case. And the children of the Rosary also looked at that very footnote and said, hey, you know what, the entire forum is the inside and the outside. It's very hard to say that the airport is a different state of captivity than looking at the outside of the signs. That makes sense. I think that's right. That's right. Thank you very much for taking the time to advise us. Oh, can we get a transcript of the argument? If you can see Ms. Brunke's show. Just split the cost. Arrangement, just split the cost of it. Thank you very much. Thank you. Please rise. This court stands adjourned until Wednesday, April 14th at 9 a.m.